[No. 16466.   Department One.   October 11, 1921.]

FIDELITY SECURITIES COMPANY, *Respondent,* v.
ORISON DICKINSON *et al., Defendants,*
MARIE M. MARTIN *et al., Appellants.*[1]

CONTRACTS (40)—VALIDITY. A contract to purchase delinquency certificates expressly authorized by statute is not invalid.

DEEDS (3) — PARTIES — DEATH OF GRANTEE BEFORE DELIVERY. Deeds executed pursuant to a contract to a grantee in ignorance of his death will be treated in equity as a deed to his estate.

SAME (55)—EVIDENCE—CONSIDERATION. Where negotiations for a conveyance are conducted by a father and a deed is executed to his daughter as grantee, the presumption, in the absence of evidence, is that the consideration was paid by the daughter.

TAXATION (191)—TAX TITLES—PRIORITY OVER PRIOR MORTGAGE. One acquiring property under a tax deed assumes no obligation to a mortgagee of the property to pay off the taxes accumulated subsequent to his mortgage, and therefore a tax title is superior to the lien of a prior mortgage.

SAME (177)—TAX DEEDS—TITLE ACQUIRED—MERGER OF ESTATES. The fact that the holder of a tax certificate took a quitclaim deed to the property from the owners before the period of redemption had expired, would not constitute a merger of the title under tax deed with that acquired by deed from the owners.

[1] Reported in 201 Pac. 301.

Appeal from a judgment of the superior court for King county, Jurey, J., entered December 23, 1920, upon findings in favor of the plaintiff, in an action to foreclose a mortgage, tried to the court. Reversed.

*Karl H. Kober* and *Walter A. Keene* (*Howard A. Adams*, of counsel), for appellant.

*Wright, Kelleher, Allen & Hilen*, for respondent.

FULLERTON, J.—On November 18, 1911, Orison Dickinson and wife owned certain real property situated in the city of Seattle. On that day they mortgaged the property to the First Mortgage & Savings Bank to secure a loan in the sum of $1,200 then made by the bank to them. Subsequent thereto the mortgage by assignments, duly and regularly executed, passed into the possession and ownership of the Fidelity Securities Company, the respondent on this appeal. No part of the principal of the loan was ever paid. Interest was paid thereon according to the terms of the loan down to the year 1916, but nothing more.

In the year 1914, Dickinson and wife conveyed the property to one William D. Ingalls, and subsequent thereto the title to the property passed by mesne conveyances through sundry holders to one Elizabeth M. Davis and one John Carrigan, in whom it was vested in the year 1919. In 1910, the city of Seattle authorized the construction of sewers in the streets and avenues abutting upon and adjacent to the property, providing in the ordinances that the cost of the sewers should be paid by assessment upon property benefited.

Pursuant to the ordinance, the city of Seattle caused an assessment to be levied upon the property in question, payable in installments. One such installment was not paid, and subsequently the city caused the property to be sold under the lien of assessment. No other purchaser appearing at the sale, the city pur-

chased the property for the amount of its lien thereon, and issued to itself a certificate of sale. On February 13, 1919, more than two years after the sale of the prop- erty to the city, C. V. Martin, acting pursuant to a con- tract entered into between himself and Theodore Zilin- sky, purchased the certificate of sale in the name of Zilinsky. Immediately after the purchase of the cer- tificate, notice was given in the name of Zilinsky to the owners of the property, under § 33, ch. 98, p. 461, Laws of 1911, that Zilinsky was the holder of the cer- tificate of sale, and that he would demand a deed to the property from the city.

After service of the notice, and prior to the expira- tion of the sixty-day period in which the owners are permitted under the statute to redeem from the sale, Martin, in the name of Zilinsky, took quitclaim deeds to the property from the owners. Between the time of the service of the notice and the delivery of the deeds Zilinsky died, a fact unknown to Martin. Zilinsky left a will in which Rudolph Beck was named as executor, and in due course he was appointed and confirmed as such by the superior court of King county. Acting in the name of the executor, Martin applied to the city for a deed to the property. At that time the sixty-day period in which Elizabeth M. Davis had the right to redeem by the terms of the statute had expired; Car- rigan's time, however, had as yet some days to run. The city officers treated his quitclaim deed as a waiver of his right, and on May 12, 1919, one day prior to the time Carrigan's right to redeem expired, issued to the ex- ecutor a deed to the property. Subsequently, and on May 29, 1919, the city issued to the executor another deed to the same property. This deed differed in no respects from the earlier deed, save that it had written on its margin the words, "Correction Deed."

By the terms of the contract between Zilinsky and

Martin, Zilinsky agreed, in the case he should obtain title to the property, to deed the same to Martin "or his daughter," for the consideration of three hundred dollars in cash and a note for fifteen hundred dollars, payable three years after its date, with interest at seven per centum, payable semi-annually, secured by a mortgage on the property. On the execution of the deed to him from the city, the executor, pursuant to the terms of this contract, and with the leave and approval of the court in which the probate proceedings were pending, conveyed the property to Marie M. Martin, a daughter of C. V. Martin, who, in turn, paid to the executor the sum of three hundred dollars in cash, and executed and delivered to him a note and mortgage in accordance with the terms of the agreement between Zilinsky and her father.

After the occurrence of these transactions, the respondent, as the owner and holder of the Dickinson mortgage, began the present action to foreclose the same. It made parties defendant to the action, among others, the executor, Beck, C. V. Martin, and Marie M. Martin. The complaint was in the usual form, and contained allegations appropriate under our form of procedure to show a lien by mortgage on the property, and a right to its foreclosure. With reference to the defendants named, it was alleged that they had, or claimed to have, some interest in or title to the mortgaged property, but that such interests or liens, if any, were subject and inferior to the plaintiff's mortgage. The defendants named answered separately. C. V. Martin's answer was a disclaimer of interest. Marie M. Martin answered, setting up title herself, claiming title superior to the lien of the plaintiff's mortgage, in virtue of the deed from the city to the executor and the deed from the executor to her. The executor's answer was to the same effect.

The cause was tried on the issues as thus framed, at the conclusion of which the court made, among others, the following findings of fact:

"(I)   All of the allegations of the plaintiff's complaint are true and correct.

"(IV) The mortgage described in the plaintiff's complaint is a valid lien upon the property described in the plaintiff's complaint to secure said sums and each of them, and said sums and all of them are due, owing and unpaid.

"(V)   Theodore Zilinsky at the instigation of C. V. Martin purchased the record title of certain delinquent tax certificates, the record title of which, after the death of Theodore Zilinsky, descended to Rudolph Beck, as executor of the last will and testament of Theodore Zilinsky, deceased, subject to an agreement whereby the title to said property was to become vested in said C. V. Martin, the said C. V. Martin to pay said Theodore Zilinsky three hundred dollars ($300) in cash and to execute a mortgage to him on said property for the sum of fifteen hundred dollars ($1,500) as compensation to said Theodore Zilinsky for the use of his name and money.

"(VI)  Subsequent to the death of Theodore Zilinsky, C. V. Martin, acting for himself and as .attorney for said Rudolph Beck, as executor of the last will and testament of Theodore Zilinsky, deceased, for the purpose of obtaining a tax deed to said premises prior to the expiration of the period of redemption, and for the purpose of securing the entire title of said property in order to convey the entire title to Marie M. Martin, C. V. Martin's daughter, purchased for a valuable consideration the fee of said premises from the owners thereof prior to the expiration of the right of redemption from said delinquent tax certificates and with the knowledge both of himself and said Rudolph Beck, executor of the last will and testament of Theodore Zilinsky, deceased, of the death of said Theodore Zilinsky, erroneously filled in the name of Theodore Zilinsky as grantee on May 11, 1919, the deeds having been delivered to said C. V. Martin with the names of the grantees

in blank and authority having been given to him to fill in the blanks.

"(VII) Rudolph Beck, as executor of the last will and testament of Theodore Zilinsky, deceased, acting through C. V. Martin as his attorney, acquired deeds from John Carrigan and Elizabeth M. Davis, the owners of said property for the purpose of inducing the treasurer of the city of Seattle to issue the said tax deeds prior to the expiration of the period of redemption and represented to the treasurer of the city of Seattle that in obtaining said deeds Rudolph Beck, as executor to the last will and testament of Theodore Zilinsky, deceased, became the owner of the fee to said premises.

"(VIII) The use of the names of Theodore Zilinsky and Marie M. Martin were merely assumed names of C. V. Martin, said C. V. Martin being the real party in interest."

As conclusions of law, the court found that the answering defendants were estopped to deny that the executor became the owner of the fee to the property prior to the date of the issuance of the deed from the city on the certificate of sale; that the title acquired by the deed from the city merged in the legal title acquired from such owners; that this title was subsequent and inferior to the lien of the plaintiff's mortgage; and that the plaintiff was entitled to a decree of foreclosure in accordance with the prayer of its complaint. A decree was entered accordingly, from which this appeal is prosecuted.

There is much in the court's findings for which we can find no support in the evidence. It is found that Theodore Zilinsky purchased the certificate of sale from the city of Seattle at the "instigation" of C. V. Martin. If the word "instigation" is here used in its evil and corrupt sense, there is nothing to support it. The evidence on the question is found in the testimony of C. V. Martin. He testifies that he and Mr. Kanters

were engaged in a small way in the real estate business; that Mr. Kanters was an old acquaintance of Mr. Zilinsky, and had made a loan for him which the borrower had repaid; that Mr. Zilinsky came to their office in connection with the matter, and inquired of Mr. Kanters whether he knew of a place where the money could be again loaned or invested; that Mr. Kanters answered that he personally knew of no such place, and called in the witness and put the inquiry to him, when he directed attention to the certificate of purchase held by the city. The result was the written contract hereinbefore mentioned. The contract was entered into after a full explanation of the procedure necessary to be pursued to acquire title under it, and of the probable expense necessary to be incurred in so doing. The contract on its face is explicit and plain. It involved in its execution nothing corrupt or evil; on the contrary, it involved a transaction expressly authorized by statute, and is such a contract as honest men with honest intention and purpose may lawfully make. Mr. Zilinsky entered into it of his own free will, and it is idle to say that he did so at the corrupt solicitation of C. V. Martin.

The finding that the deeds from the owners of the fee to Zilinsky were delivered to C. V. Martin without naming a grantee, and that he, with the knowledge of both himself and the executor, Beck, of the death of Zilinsky, "erroneously filled in the name of Theodore Zilinsky as grantee," is likewise without support in the evidence. The undisputed evidence is that at this time the executor, Beck, knew nothing at all of the transaction, and that Martin did not then know of the death of Zilinsky. The undisputed evidence shows, also, that the grantees' names were inserted in the deeds when they were delivered. The evidence is that C. V. Martin bargained for the purchase of the owner's interest; that this bargaining was made with the agents of the

owners and not with the owners directly; that, after the terms had been agreed upon, the agents procured the deeds from their principals with the grantee's name left blank, with the authority to fill in the name of such person as Martin directed, and that Martin, when the deeds were tendered him, directed that the name of Zilinsky be inserted, and that his name was inserted by the agents before delivery. Manifestly there was nothing "erroneous," corrupt or illegal in this. The intervening death of Zilinsky in no manner affected the legality of the transaction. It was the intention of the grantors to convey the fee. It was the intent of Martin that the title should pass to Zilinsky in accordance with the terms of the contract entered into between himself and Zilinsky. Justice demands that it be so treated, and equity, under a familiar maxim, will treat the conveyances as conveyances to Zilinsky's estate.

Again, the finding that the use of the names of Theodore Zilinsky and Marie M. Martin were merely assumed names of C. V. Martin, "said C. V. Martin being the real party in interest," is also contrary to the evidence. Zilinsky, in his lifetime, advanced the money necessary to finance the transaction, and out of the money so advanced were paid the costs and expenses of procuring the deed from the city. These amounted to a considerable sum. There was paid four hundred and fifty dollars to procure the deeds from the owners of the fee, there was paid more than seven hundred dollars in general state, county and municipal taxes, which the law exacted as a condition precedent to receiving a deed to the property under the city's certificate of purchase; there was paid the amount of the assessment for which the property was sold to the city, with the accumulated costs and interests; and there was paid the costs and expenses of procuring the deed

which involved proceedings in the probate department of the superior court. The amount of these latter items was not shown, but enough is shown to make it certain that there was no great profit in the transaction for Zilinsky's estate. On these advancements the estate has been repaid three hundred dollars in cash, and there has been executed to it a note for fifteen hundred dollars, secured by mortgage on the property. Contrary to the inference which the finding imports, therefore, Zilinsky, in his lifetime, had a substantial interest therein. What the business relations between C. V. Martin and his daughter Marie were, the record does not disclose. Nor does the record disclose whether C. V. Martin or the daughter furnished the cash consideration which was paid to Zilinsky's estate on the execution of the deed. But if this question be material, and it be necessary so to do, the law will presume that it was paid by the daughter. But the record does show affirmatively that it is the daughter and not C. V. Martin who now holds the substantial interest. She has the legal title to the property, and to procure that legal title has obligated herself to pay to the source from which she acquired title the sum of fifteen hundred dollars. C. V. Martin, on the face of the record at least, has now no interest in the transaction whatsoever and is in no wise bound by any contract. It is well to remember, also, in this connection, that the conveyance to the daughter is not an afterthought on the part of anyone. The very contract entered into between Zilinsky and C. V. Martin at the inception of the transaction provides that title to the property when acquired by Zilinsky shall be conveyed to C. V. Martin "or to his daughter." The finding, therefore, that the daughter is without interest has likewise no support in the evidence.

If, then, the decree of the trial court is to be sustained, it must be sustained on the theory stated in the court's conclusions of law, namely, that there has been an estoppel by merger. But we cannot think there is any foundation for this conclusion. Perhaps no better argument on the question can be made than is made by Judge Cooley, in his work on Taxation, vol. 2, p. 972 (3d ed.), where he says:

"It has been very properly held that one who has conveyed lands with warranty cannot, as against his grantee, acquire a tax-title for taxes, any part of which were on the land when his conveyance was given. So he who, pending an injunction sued out by himself to restrain the enforcement of a mechanic's lien, obtains a tax-title, will not be allowed to make use of it to defeat the lien. So a guardian cannot destroy the estate of his wards by purchasing a tax-title adverse to them. So a tax-title to land acquired by one who holds the legal title to the land in trust to secure the legal payment of a debt is also held in trust. So a beneficiary under a trust deed cannot acquire a tax-title adverse to the trust. And any purchase by one who, by contract or otherwise, was under obligation to pay the taxes, will be deemed a payment only. But one who has been in possession under a contract of purchase which he has surrendered is not precluded from buying.

"Whether one should be precluded by the naked fact that he claims title to the land, or that he has possession of it, from making a purchase in extinguishment of the right of another with whom he stands in no contract or fiduciary relations, is a question often touched by the discussion of courts without having as yet been very fully or comprehensively examined. So far as the cases hold that one who ought, as between himself and some third person, to pay the taxes, shall not build up a title on his own default, the principle is clear and well-founded in equity. But when one owes no duty to any other in respect to the land, it is not so clear upon what principle of equity or of estoppel such other is to set up, as against him, his neglect to perform in due season his duty to the state.

"There are some cases in which it has been distinctly held that possession, when the tax was assessed, fixed upon the possessor the duty to pay, and precluded his becoming a purchaser at a sale for the taxes when they became delinquent. In the leading case the occupant had gone into possession under an invalid tax-title, and by the decision he was precluded from relying upon a second title which accrued while he was in the occupancy of the land. The subject is dismissed with very brief mention, the court appearing to regard the claim as inequitable and unjust, but for what reason is not very clearly explained. Other cases treat the point as equally plain. But it seems to be very well deserving of more consideration whether, where parties stand to each other in the position of adverse claimants to land, either of them can insist that the other shall discharge for his protection a duty owing to the public. There being nothing in the relation of the parties to each other upon which an estoppel can be raised, it is necessary to look elsewhere for the disqualification insisted upon; and this can only be found in some general rule of public policy. It is certainly an imperative requirement of public policy that the revenues of the state shall be collected, and that no one shall be allowed to defraud the treasury of his due proportion; but in the case where a tax sale has been made there is no fraud, and the revenue chargeable upon the land has been received. No wrong has consequently been done to the state. There has been delay in payment, but it is one for which the state makes ample provision, and for which it charges and collects all costs, as well as a further sum under the name of interest or penalty sufficient fully to compensate for any public inconvenience. It is not perceived that the state can then have any complaint to make, as the duty owing to it, though performed tardily, has been performed at last, and the incidental inconvenience paid for. The state, then, not being wronged in the purchase, it would seem that if any individual objects to it he ought to be able to point out how and in what particular it wrongs him.

"It is difficult to dispute the truth of what is said by the supreme court of Pennsylvania, that 'there is noth-

ing in reason or law to prevent a man who holds a defective title from purchasing a better at a treasurer's sale for taxes.' As between himself and any adverse claimant, the state is not concerned to inquire whether the one or the other was in possession. If the state, in taxing land, takes any notice of ownership, it is either for the convenience of the officers in making collections or for information to parties concerned. The tax is upon every possible interest in the land; and all parties having interest are equally under obligation to the state to make payment. The penalty for failure is a forfeiture or sale which will cut them all off; and while, without doubt, anyone may defeat such a sale who can give satisfactory reasons for an assertion that it would be unjust to him for the purchaser to be allowed to rely upon it, it is not perceived that any other person can, upon plausible grounds of equity, insist upon the privilege to do so. There are decisions that the possession of a mere intruder or trespasser will not preclude his becoming purchaser; if this is true, mere possession ought not to be an impediment in any case; for the element of wrong involved in the possession of a trespasser cannot, on any grounds of equity or justice, be taken notice of as giving him a privilege denied to one whose possession is rightful.''

The case presented for the appellants is even stronger than cases considered by Judge Cooley. The appellants never had possession of the property and never enjoyed any of its rents, issues or profits. The taxes and assessments for which they purchased the property from the city accrued prior to the time they acquired the legal fee from the owners, and they assumed by acquiring the fee no obligation to anyone, not even the state, to pay these accumulated taxes and assessments. No principle of law, equity or morals, therefore, required them to make the payment for the benefit of a mortgagor to whom they were in no manner obligated and whose mortgage antedated the accumulation of the taxes. Again, the doctrine of merger is ap-

plicable only in those instances where a lesser and a greater estate unite in the same person and there is no intermediate estate; and the courts which hold that a title acquired from a tax sale merges in a title derived by grant from the original proprietor do so for the stated conclusion that a tax title is inferior to the granted title. In none of the cases cited is a reason given for the conclusion, and we agree with Judge Cooley that no sound reason exists therefor. Manifestly, in this instance, if either of the titles acquired by the appellants was superior in law or equity to the other, the tax title is the superior title. The fee title was taken subject to all the existing liens on the property, the mortgage as well as the assessment and taxes. The tax title eliminated the mortgage, and on the doctrine as stated, if there is to be a merger at all, it would seem that the fee title merged into the tax title. But, in our opinion, no case is presented for the doctrine of merger. The appellants hold title through two independent sources, and they may plead and rely upon either or both against the suit of any person who asserts an interest in the property.

The decree appealed from is reversed, and the cause is remanded with instruction to enter a decree holding the appellants' title to be superior and paramount to the respondent's mortgage.

PARKER, C. J., HOLCOMB, and BRIDGES, JJ., concur.